The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
May 13, 2021

## 2021COA65

## No. 17CA1911, People v. Garcia — Constitutional Law — Fifth Amendment — Double Jeopardy; Criminal Law — Second Trial Barred by Prosecution in Another Jurisdiction

This case is the first to conclude that section 18-1-303, C.R.S. 2020 does not apply to prior prosecutions by foreign countries, distinguishing *People v. Morgan*, 785 P.2d 1294 (Colo. 1990).

COLORADO COURT OF APPEALS                                    **2021COA65**

Court of Appeals No. 17CA1911
Mesa County District Court No. 89CR901
Honorable Lance P. Timbreza, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Rafael Aguilar Garcia,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE GRAHAM*
Dailey and Tow, JJ., concur

Announced May 13, 2021

Philip J. Weiser, Attorney General, Brian M. Lanni, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     Defendant, Rafael Aguilar Garcia, appeals his conviction for first degree murder.  He contends that double jeopardy barred his retrial and that the trial court erred by instructing the jury that it could not consider self-defense.  We reject these contentions and affirm his conviction.  We also conclude, for the first time, that section 18-1-303, C.R.S. 2020, does not apply to prior prosecutions by foreign countries, distinguishing *People v. Morgan*, 785 P.2d 1294 (Colo. 1990).

## I.     Background

¶ 2     Evidence adduced at trial demonstrated the following.  In 1989 Garcia and his wife, J.G., separated.  Garcia told J.G. that if he saw any men at the house, they would be dead.  Thereafter, J.G. began a relationship with C.P., and Garcia said he would kill C.P. if he went near J.G.  Garcia also struck C.P.'s car from behind at a gas station and wrote several journal entries about his hatred for C.P. and his intent to kill him.

¶ 3     One night, a little after midnight, J.G. and C.P. were watching a movie together in J.G.'s living room when Garcia came to the door with a pump-action shotgun.  Garcia struck J.G. in the head with it, and C.P. began fighting with Garcia.  Garcia stabbed C.P. in the

1

back with a knife. C.P. ran into a bedroom and locked the door. Garcia fired the shotgun through the door, fatally hitting C.P. in the chest and head.

¶ 4     Garcia fled to Mexico. The Mesa County District Attorney's Office attempted to extradite Garcia; however, its efforts were unsuccessful. As an alternative to extradition, the District Attorney's Office, along with the Foreign Prosecutions Unit at the Colorado Attorney General's Office, compiled a casebook and sent it to Mexico so Garcia could be prosecuted under Article IV of Mexico's Federal Penal Code. The Mexican tribunal considered the case on submitted documents. Garcia was acquitted of C.P.'s murder in Mexico.

¶ 5     In 2016, Garcia was arrested on an outstanding Colorado warrant upon arriving at Denver International Airport.

¶ 6     At the trial here, Garcia testified in his own defense. According to Garcia, J.G. had answered the door that night while C.P. snuck out another door and attacked him from behind. A struggle ensued, J.G. attempted to call the police, and Garcia cut the phone cord with a knife. C.P. retreated into a bedroom and locked the door. Garcia pursued C.P., broke a hole in the door with

the barrel of the gun, and blindly fired the shotgun twice through the hole. Both shots incidentally struck C.P. in the chest and head.

¶ 7    Garcia testified that he did not mean the threats he wrote in his journal but conceded that he knowingly killed C.P. and that he did not act in self-defense. Garcia argued that the killing was committed under a sudden heat of passion, which, in 1989, constituted manslaughter. The jury convicted him of first degree murder, and Garcia now appeals.

## II.    Double Jeopardy

¶ 8    Garcia first argues that because he was acquitted of C.P.'s murder in Mexico, his retrial in Colorado violated his right to be free from double jeopardy under the federal and state constitutions. He further argues that his conviction violated his right to be free from double jeopardy as extended and codified in section 18-1-303. He also argues that the common law doctrines of jurisdictional waiver and laches prevented his retrial and conviction. We disagree with all these arguments.

A.    Neither the Federal Constitution Nor the Colorado
Constitution Barred Garcia's Prosecution in Colorado

1.    Standard of Review and Preservation

¶ 9    We review double jeopardy claims de novo. *People v. Frye,*
2014 COA 141, ¶ 30. Garcia preserved his double jeopardy claim
by filing a motion to dismiss on double jeopardy grounds in the trial
court.

2.    Law

¶ 10    Both the federal and state constitutions contain provisions
protecting individuals from being "twice put in jeopardy" for "the
same offense." U.S. Const. amends. V, XIV; Colo. Const. art. II,
§ 18. As pertinent here, these provisions generally protect an
individual against a second prosecution after an acquittal for the
same offense. *See People v. Leske*, 957 P.2d 1030, 1035 n.5 (Colo.
1998).

¶ 11    Under the dual-sovereignty doctrine, separate sovereigns like
"the state and federal governments may prosecute a person for the
same offense without violating the double jeopardy prohibition of
the federal constitution." *Chatfield v. Colo. Ct. of Appeals*, 775 P.2d
1168, 1174 n.7 (Colo. 1989). "The dual sovereignty doctrine is

4

founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" *Heath v. Alabama*, 474 U.S. 82, 88 (1985) (citation omitted).

¶ 12     In *Bartkus v. Illinois*, the Supreme Court suggested an exception to the dual-sovereignty doctrine for sham prosecutions. 359 U.S. 121, 123-24 (1959). A prosecution by one sovereign is a sham, precluding the application of the dual-sovereignty doctrine, where one sovereign dominates, controls, and manipulates the other sovereign into prosecuting the defendant. *Id.*; *see United States v. Moore*, 370 F. App'x 559, 561 (5th Cir. 2010) (per curiam); *United States v. Dowdell*, 595 F.3d 50, 63 (1st Cir. 2010). The *Bartkus* exception is narrow and hard to prove. *United States v. Rashed*, 234 F.3d 1280, 1282 (D.C. Cir. 2000). "[R]outine intergovernmental assistance" and "[c]ooperative law enforcement efforts" between independent sovereigns, without more, do not satisfy the *Bartkus* test. *Dowdell*, 595 F.3d at 63 (quoting *United States v. Guzman*, 85 F.3d 823, 828 (1st Cir. 1996)); *Moore*, 370 F. App'x at 561.

### 3.    Application

¶ 13    Garcia was tried for and convicted of C.P.'s murder in Colorado after his acquittal for the same crime in Mexico.  There is no dispute that Mexico qualifies as a sovereign nation for purposes of the dual-sovereignty doctrine.  *United States v. Hughes*, 211 F.3d 676, 688 (1st Cir. 2000); *see Moore*, 370 F. App'x at 560.  Nonetheless, Garcia urges us to hold that double jeopardy barred his retrial in Colorado because Mexico's legal authority to prosecute Garcia depended entirely upon the explicit consent and aid of Colorado authorities who compiled a casebook and presented it to Mexican prosecutors.

¶ 14    True, the Mesa County District Attorney's Office decided to participate in a foreign prosecution in Mexico under Article IV after multiple unsuccessful attempts to extradite Garcia.  However, after presentation of the casebook, no Colorado officials were actively involved in the case in Mexico.

¶ 15    Preparing a casebook and presenting it to the Mexican tribunal falls far short of domination, control, or manipulation of the Mexican government.  Rather, as in *Moore*, Garcia has failed to show or even allege that Colorado "so thoroughly dominated or

6

manipulated" the Mexican prosecutorial machinery that the Mexican authorities "retain[ed] little or no volition" in their own proceedings such that they were a "mere tool" of their counterparts in Colorado. *See Moore*, 370 F. App'x at 560-61. Instead, his argument that Mexico's legal authority to prosecute Garcia depended entirely upon the explicit consent and aid of Colorado authorities is barely sufficient to show routine intergovernmental assistance and cooperation.

¶ 16    Accordingly, Garcia's argument that his prosecution was barred by the Double Jeopardy Clauses of the United States and Colorado Constitutions fails.

B.    Section 18-1-303 Does Not Apply to Foreign Prosecutions

¶ 17    We now address, as a matter of first impression, whether section 18-1-303 applies to prosecutions in foreign countries. Based on the plain language of the statute, we conclude that it does not.

1.    Standard of Review and Preservation

¶ 18    Statutory interpretation is a question of law that we review de novo. *Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189

(Colo. 2010). Garcia preserved this claim by filing a motion to dismiss under section 18-1-303 in the trial court.

## 2. Law

¶ 19 When interpreting a statute, we look first to its plain language. *Smith*, 230 P.3d at 1189. When the plain language is clear, our job ends, and we must apply the statute as written. *Id.*

¶ 20 We may not add words to or subtract words from the statute. *See People v. Diaz*, 2015 CO 28, ¶ 12; *People v. Benavidez*, 222 P.3d 391, 393-94 (Colo. App. 2009) ("[I]n interpreting a statute, we must accept the General Assembly's choice of language and not add or imply words that simply are not there."). Additionally, "when the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others." *Lunsford v. W. States Life Ins.*, 908 P.2d 79, 84 (Colo. 1995).

¶ 21 Despite the ability of separate sovereigns to prosecute an individual for the same offense, many states, including Colorado, have partially rejected or limited this doctrine by statute. *See* § 18-1-303. Section 18-1-303 provides, in pertinent part, as follows:

(1) If conduct constitutes an offense within the concurrent jurisdiction of this state and of the United States, or another state, or of a municipality, a prosecution in any other of these jurisdictions is a bar to a subsequent prosecution in this state under either of the following circumstances:

(a) The first prosecution resulted in a conviction or an acquittal as defined in section 18-1-301(1)(a) and (1)(c), and the subsequent prosecution is based on the same conduct, unless:

(I) The offense for which the defendant was formerly convicted or acquitted requires proof of a fact not required by the offense for which he is subsequently prosecuted and the law defining each of the offenses is intended to prevent a substantially different harm or evil . . . .

### 3. Application

¶ 22 Section 18-1-303 bars prosecutions in Colorado when there has been a prosecution (that resulted in a conviction or acquittal) for the same conduct in "the United States, . . . another state, or . . . a municipality." Foreign countries are not among the enumerated jurisdictions within the scope of the statute, and we may not add this term to the statute.

¶ 23 Nonetheless, Garcia relies on *People v. Morgan*, 785 P.2d at 1298, and its statement that "[t]he better reading of section

9

18-1-303 uniformly abolishes the dual sovereignty doctrine, prohibiting prosecution under Colorado law when the defendant has been subjected to a prior prosecution by *any* separate sovereign — federal, state or tribal."

¶ 24    We are, of course, bound by the supreme court's holding in *Morgan*. *See In re Estate of Ramstetter*, 2016 COA 81, ¶ 40. But this case is distinguishable from *Morgan* and involves facts and circumstances not present in that decision.

¶ 25    First, despite the court's statement in *Morgan* that section 18-1-303 "uniformly abolishes the dual sovereignty doctrine" and that it prohibits a Colorado prosecution when there has been a "prior prosecution by *any* separate sovereign," the court itself limited its holding to "federal, state or tribal" sovereigns. 785 P.2d at 1298. A foreign nation is not a federal, state, or tribal sovereign.

¶ 26    Second, *Morgan*'s holding was premised on the fact that section 18-1-303 was enacted before the Supreme Court's decision in *United States v. Wheeler*, 435 U.S. 313 (1978), *superseded by statute*, 25 U.S.C. § 1301. *Morgan*, 785 P.2d at 1297-98. *Wheeler* held that Native American tribes are separate sovereigns from the United States for double jeopardy purposes. 435 U.S. at 322;

*Morgan*, 785 P.2d at 1297-98. "Thus, when section 18-1-303 was first adopted, the legislature justifiably could have believed that tribal prosecutions were comprehended within prosecutions by the United States" and therefore were within the statute's scope as written. *Morgan*, 785 P.2d at 1297-98.

¶ 27 Like tribal nations, foreign nations are not expressly included in section 18-1-303. However, unlike the tribal nations whose separate sovereignty from the United States for double jeopardy purposes was confirmed after the enactment of section 18-1-303, the same cannot be said of foreign nations. As pertinent here, Mexico became a sovereign nation long before the Colorado General Assembly enacted section 18-1-303.[1]

¶ 28 Third, while the General Assembly may have understood the term "United States" to encompass prosecutions by tribal courts at the time of enactment, there is no reason to believe the General Assembly understood the terms "United States," "another state," or "municipality" to encompass foreign countries like Mexico.

---

[1] In 1821, Mexico won its independence from Spain. *See, e.g.*, *Ely's Adm'r v. United States*, 171 U.S. 220, 228 (1898). The present form of section 18-1-303 was enacted in 1971. Ch. 121, sec. 1, § 40-1-403, 1971 Colo. Sess. Laws 388, 397.

¶ 29    Nevertheless, Garcia argues that the term "another state" in the statute includes not only the states within the United States, but also the states of Mexico.  This interpretation would mean that a previous prosecution in Mexico, where there are states, would prohibit subsequent prosecution in Colorado, but a previous prosecution in Canada, where there are provinces, would not prohibit subsequent prosecution in Colorado.

¶ 30    A statutory interpretation that leads to an illogical or absurd result will not be followed.  *See Frazier v. People*, 90 P.3d 807, 811 (Colo. 2004).  An interpretation that hinges on the term a foreign nation has assigned to its political subdivisions is illogical and absurd.  Therefore, we do not adopt this interpretation.

¶ 31    To the extent Garcia argues that the phrase "another state" encompasses any foreign country, that argument also fails.

¶ 32    Many Colorado statutes demonstrate that where the General Assembly intends to refer to foreign countries in a statute, it does so explicitly.  *See, e.g.*, § 16-19-117(1), C.R.S. 2020 ("[T]he judge of any district court within the state of Colorado may admit any person arrested, held, or detained for extradition or interstate rendition to *another state* or territory of the United States *or to any*

*foreign country . . . .*") (emphasis added); § 33-1-102(38)(e), C.R.S. 2020 (a person terminates his Colorado residence by registering to vote in "another state or foreign country"); § 38-13-1203(1), C.R.S. 2020 ("The administrator may join *another state or foreign country* to examine and seek enforcement of this article 13 against a putative holder.") (emphasis added).

¶ 33    The General Assembly's use of both "another state" and "foreign country" in these statutes demonstrates that it does not intend one phrase to encompass the other.  If the legislature intended the phrase "another state" to include foreign countries, the language in these statutes, and others, would be redundant.  *See People v. Trupp*, 51 P.3d 985, 988 (Colo. 2002) (courts avoid statutory interpretations that render language redundant or superfluous).

¶ 34    Accordingly, section 18-1-303 did not bar Garcia's subsequent prosecution in Colorado.[2]

---

[2] Even if section 18-1-303, C.R.S. 2020, did bar prosecutions in Colorado after a foreign prosecution, it would not apply here because C.P.'s murder was not an offense within the "concurrent jurisdiction" of Mexico and Colorado.  Garcia killed C.P. in Colorado.  Mexico does not ordinarily have jurisdiction to prosecute

## C.  The Doctrines of Jurisdictional Waiver and Laches Do Not Apply

¶ 35    Garcia next argues, for the first time on appeal, that the State of Colorado voluntarily relinquished jurisdiction over the entire case to Mexico when it pursued an Article IV prosecution, and that laches barred his retrial.

¶ 36    True, the government may waive its jurisdiction over a criminal defendant.  *See Brown v. Brittain*, 773 P.2d 570, 572 (Colo. 1989).  However, the cases Garcia cites for that proposition are readily distinguishable.

¶ 37    In *Brittain*, for example, our supreme court acknowledged that a prisoner who was mistakenly released through no fault of his own may receive credit against his sentence for the time he was at liberty, in part because the "failure to attempt to regain custody of the prisoner within a reasonable time constitutes a waiver of jurisdiction over the prisoner."  *Id.*  The situation here is not remotely similar.  The State of Colorado did not somehow neglect to

---

crimes committed in Colorado.  Rather, Mexico acquired jurisdiction to prosecute Garcia under Article IV only after he fled to Mexico and only while he remained there.  Therefore, Mexico's jurisdiction was not concurrent with Colorado's, and section 18-1-303 did not bar his subsequent prosecution here.

prosecute Garcia or ignore the fact that he fled the jurisdiction to escape a murder charge. Because Mesa County officials were unsuccessful in their repeated attempts to extradite Garcia, they decided to pursue an Article IV prosecution in Mexico. Sending a casebook to Mexico to allow Mexico to pursue an Article IV prosecution, unlike the mistaken decision to release a prisoner early, does not amount to a jurisdictional waiver.

¶ 38    Laches, the "equitable doctrine that may be asserted to deny relief to a party whose unconscionable delay in enforcing his rights has prejudiced the party against whom relief is sought," is likewise inapplicable. *Robbins v. People*, 107 P.3d 384, 388 (Colo. 2005).

¶ 39    Laches does not bar the prosecution of a defendant who returns to the state jurisdiction after having absconded for many years. *See Warren v. Warren*, 112 A. 729, 730 (N.J. Ch. 1921).

¶ 40    Furthermore, there was no unconscionable delay on the part of the Mesa County District Attorney's Office. Instead, the record reveals that Mesa County filed a complaint in 1989 (one day after Garcia killed C.P.), made multiple unsuccessful attempts to extradite Garcia, compiled a casebook and sent it to Mexico for an Article IV prosecution, and brought Garcia to trial within one year

of his arrival in the United States in 2016. The fact that Garcia fled the country does not amount to a lack of diligence on the part of the Mesa County District Attorney's Office. Nor has Garcia presented any evidence that he was somehow prejudiced by the delay in prosecution. Therefore, these claims fail.

### III. Jury Instructions

¶ 41 Garcia argues that the trial court reversibly erred by instructing the jury that the defense had not asserted self-defense and that the jury could not consider self-defense in its deliberations. He further argues that the instruction undermined his heat of passion defense. He posits that he "claimed a lesser or imperfect form of self-defense, namely, heat of passion manslaughter" and that the instruction improperly advocated for the prosecution's theory of the case, in effect negating the heat of passion manslaughter argument.

¶ 42 The parties disagree as to whether this latter contention was preserved, but because we conclude that the trial court's decision to give this instruction was not an abuse of discretion, we need not resolve this disagreement. Consequently, it did not undermine any hybrid heat of passion defense that Garcia now advances.

16

## A.     Additional Facts

¶ 43     At the jury instruction conference, the district attorney submitted an additional instruction clarifying that the defense was not claiming self-defense:

> [Prosecutor]: I'm actually submitting another instruction. And this I'm submitting based on the flavor and the actual spoken words of the Defendant during his testimony yesterday. There was a clear self-defense spin on what happened. And I think it's important to know that the Defense has not asserted the defense of self defense and they should not be considering self defense in their deliberations.
>
> I think it was so apparent, not that this is tangible evidence of this, but I think it's something the court can consider for the record the headline in today's paper said something to the effect of: The Defendant claims or Mr. Garcia claims self defense. Self defense was in the caption of [a] newspaper article.
>
> Now why is that relevant? I think it's relevant because it goes to show that someone sitting in the courtroom, hearing testimony from the Defendant, then proceeded to characterize it as him claiming self defense. He was asked questions along those lines and certainly he put a self-defense spin on what he did. That he was attacked and he was reacting to the attack more than being the instigator of the violence himself.

And certainly, when we get into initial aggressor/self defense issues, it becomes very complicated.  I think it's important to allay any thoughts the jury might have that this is in any way a self-defense claim.

And it's entirely consistent with what has transpired in this case.  They have not asserted a defense of self defense and they may not consider self defense.

. . . .

[Defense Counsel]: And I object to this instruction, Your Honor.  It wasn't brought up by the Defense that this was a self-defense case.  If the Court remembers, the testimony from Mr. Garcia yesterday toward the end of the day, it was actually Mr. Tuttle [the prosecutor] who brought up the word "self defense."  I objected to my client being questioned about the legal terminology of self defense.  That was overruled.  He was able to speak about that.  So for the DA to be able to question him on self defense even though I myself had not questioned him on self defense, I think that they have introduced that information to the jury and I don't believe that this instruction is necessary.

There's a blanket instruction in the [model criminal jury instructions] and I don't have it in front of me but it's something along the lines of you have all of the evidence that you have to consider.  At least I think that's usually an instruction that's given.  I'm going to have to look that one up.

18

But I just think that this goes above and beyond when it was actually the prosecution who brought up the self defense information during Mr. Garcia's cross examination.

. . . .

The Court: All right. And then as to the self defense instruction, it is true that there has not been an instruction as to self defense being an affirmative defense in this case. The Court finds based upon the testimony it's at least confusing to the jury as to whether or not that is what was being — that was part of the theory of defense. And so the instruction simply indicating that the defense is not asserting the defense of self defense and you may not consider self defense in your deliberations is consistent with both the case and the law. And so the Court will give that one-sentence instruction.

¶ 44    The trial court instructed the jury as follows: "The Defense has not asserted the defense of self defense and you may not consider self defense in your deliberations."

## B.    Law

¶ 45    A trial court has a duty to correctly instruct the jury on all matters of law. *People v. Espinosa*, 2020 COA 63, ¶ 8. "We review de novo whether a particular jury instruction correctly state[d] the law. However, we review for an abuse of discretion a trial court's decision to give a particular jury instruction." *People v. McClelland,*

2015 COA 1, ¶ 14 (citation omitted).  The trial court has wide discretion to determine the form and style in which the instructions will be given to the jury.  *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375, 1377 (Colo. App. 1996).  A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law.  *Nibert v. Geico Cas. Co.*, 2017 COA 23, ¶ 8.

¶ 46     Despite a trial court's broad discretion to determine form and style, instructions that emphasize specific evidence are generally disfavored.  *Krueger v. Ary*, 205 P.3d 1150, 1157 (Colo. 2009); *People v. Nerud*, 2015 COA 27, ¶ 43.  Instructions that emphasize specific evidence potentially confuse and misdirect the jury.  *Krueger*, 205 P.3d at 1157; *People v. Mandez*, 997 P.2d 1254, 1270-71 (Colo. App. 1999).

## C.    Application

¶ 47     In closing argument defense counsel argued, "We haven't said this was self defense.  We didn't endorse self defense."  Therefore,

the trial court's instruction that the defense had not asserted self-defense was accurate.[3]

¶ 48     Moreover, absent any showing of arbitrariness, unreasonableness, unfairness, or misapplication of the law, we cannot conclude that the trial court's decision to instruct the jury that self-defense was not an asserted defense and should not be considered in its deliberations amounted to an abuse of discretion. The instruction did not comment on evidence adduced at trial and dealt only with a theory of the case — a theory that the defense openly rejected in argument to the jury.  The instruction simply reinforced Garcia's position and said nothing about the defense of heat of passion.

¶ 49     The self-defense instruction was given after the trial court found that Garcia's testimony had made the issue of whether Garcia was claiming self-defense confusing.  It did not invite

---

[3] To the extent Garcia claims that he was entitled to a self-defense instruction, the record reveals not only did Garcia never request a self-defense instruction but also he expressly disclaimed self-defense as a defense.  Therefore, any argument that Garcia was entitled to a self-defense instruction was waived, and we do not address that argument any further.  *People v. Rediger*, 2018 CO 32, ¶ 40 ("[A] waiver extinguishes error, and therefore appellate review . . . .").

21

confusion or encourage the jury to focus on particular evidence. Rather, the self-defense instruction clarified that self-defense was not a defense that had been offered by Garcia.

¶ 50     Garcia claimed that he killed C.P. not after deliberation, but in a sudden heat of passion. The trial court gave Garcia's requested theory of defense instruction, an instruction for the lesser included offense of second degree murder, and a heat of passion manslaughter instruction.

¶ 51     We note the evidence that Garcia murdered C.P. after deliberation (and was therefore guilty of first degree murder) was overwhelming. In the weeks leading up to the crime, Garcia struck C.P.'s car from behind at a gas station. Garcia wrote several journal entries about his hatred for C.P. and his intent to kill him. Garcia even told J.G. that he would kill C.P. if he went near J.G. On the night of the shooting, Garcia bashed a hole in the door that C.P. was hiding behind, stuck the muzzle of a shotgun through the hole, and fired. Based upon this evidence, the trial court's allowance of the heat of passion defense and clarification that self-defense had not been pleaded were not an abuse of discretion.

## IV. Conclusion

The judgment of conviction is affirmed.

JUDGE DAILEY and JUDGE TOW concur.